## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

EMILY MIRANDA,

              Plaintiff,

v.

WESTOVER SCHOOL, INC.,

              Defendant.

Civil Action No.
3:20-CV-123 (CSH)

**SEPTEMBER 21, 2022**

### RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [Doc. 40]

**HAIGHT, Senior District Judge:**

In this diversity action, Plaintiff Emily Miranda alleges that while she was a student at Defendant Westover School, she was sexually abused by a member of the Westover faculty. Miranda brings this action against Westover to recover her resulting damages.

Westover denies liability. Following extensive discovery, Westover now moves for summary judgment dismissing Miranda's complaint. Miranda resists that motion. This Ruling resolves it

### I. Background

The facts recited in this Part are derived from the parties' pleadings, and are not disputed.

Defendant Westover School ("Westover" or "the School"), incorporated under the laws of Connecticut,  is an independent college-preparatory day and boarding school for girls, located in Middlebury, Connecticut.  It offers grades 9-12.  Doc. 1 ("Complaint"), ¶¶ 3,7.

Plaintiff Emily Miranda, presently a citizen of the District of Columbia, was a resident of Connecticut and a student at Westover from the fall of 2003 to the spring of 2007.  *Id.* ¶¶ 2, 8. During that period she was 14-17 years old.  *Id.* ¶ 8.

1

While Miranda was a student at Westover, the School employed one Allen Fitzsimmons as a teacher, assistant athletic director, and squash coach. Doc. 1, ¶ 10; Doc. 42-4 (Ex. 4 to "Local Rule 56(a) Statement of Undisputed Material Facts"), at 2. Westover provided Fitzsimmons with an office and an apartment on the School campus. Doc. 1, ¶ 10. The gravamen of Miranda's Complaint is that Fitzsimmons subjected her to sexual abuse during her time at Westover. Miranda alleges that Fitzsimmons' conduct caused her permanent damage.

The parties do not dispute that Fitzsimmons acted as a sexual predator while he was in Westover's employ, or that Miranda was a victim of that wrongdoing. In 2012, Fitzsimmons was convicted in a Connecticut state court on a charge of first-degree reckless endangerment for his sexual assaults on Miranda. *Id.* ¶ 36.

The central dispute in the case at bar is whether Westover School is liable for damage inflicted upon Emily Miranda by Allen Fitzsimmons' wrongful conduct during his employment by Westover. Miranda's Complaint [Doc. 1] against Westover alleges four claims for relief: first, negligence; second, negligent infliction of emotional distress; third, recklessness; and fourth, intentional infliction of emotional distress.

Westover's answer denied liability on all these claims. The parties then engaged in extensive discovery. Westover now moves for summary judgment which, if granted, would result in the dismissal of all four claims alleged in Miranda's Complaint.

## II. The Dispositive Issue

Miranda's Complaint against Westover School seeks to hold the School liable for Allen Fitzsimmons' sexual harassment of Emily Miranda. Each of the four claims Miranda alleges in the Complaint has that objective. For the reasons that follow, each claim turns upon the same disputed

and dispositive issue.

The Complaint's first claim for relief bears the caption "Negligence" which is followed by 46 separate numbered paragraphs.  Paragraph 11 alleges:

> Prior to and during Emily's attendance at Westover, the defendant knew and should have known that Fitzsimmons was a sexual predator and child molester who desired and preyed on minor female students in the school's care and custody.

Doc. 1, ¶ 11.  The more artful phrasing of this allegation would be "knew **or** should have known."

That is clearly Plaintiff's intended theory of the case, and I give the allegation that reading in this Ruling.

Westover's motion for summary judgment asserts:

> There is no dispute of material fact that Westover did not have notice of any intent by anyone associated, affiliated or employed by Westover to harm the plaintiff and therefore Westover is entitled to judgment as a matter of law.

Doc. 40, at 1. That assertion, cast in general terms, is obviously intended to include Fitzsimmons, an interpretation clarified by Westover's accompanying brief:

> The plaintiff's claims against Westover are legally insufficient and cannot stand as there is no evidence of the essential elements of notice, constructive or otherwise, and foreseeability.  Westover never had any notice of or reason to believe that *Fitzsimmons*  would ever abuse a student.

Doc. 41, at 5 (emphasis added).

It must be noted, then, that the parties take diametrically opposing positions with respect to whether, at the relevant time of Emily Miranda's enrollment at the School,  Westover's responsible supervisors had notice of and knowledge about Fitzsimmons' predisposition toward sexual abuse of students.

That is the key factual dispute in the case. It runs like a leitmotiv through Miranda's Complaint against Westover. In sequential paragraphs, the Complaint alleges: "Prior to and during Emily's attendance at Westover, Connecticut law imposed upon the school a mandatory duty to report to child welfare authorities if there was reasonable cause to believe that one or more students were being or had been sexually abused by an employee of the school," Doc. 1, ¶ 14; that mandatory reporting duty accrued "if there was reasonable cause to believe that one or more students were in danger of being sexually abused by an employee of the school, even if there was no reasonable cause to suspect that any such abuse had actually occurred," *id.* ¶ 15; and "[d]espite reasonable cause to believe that Fitzsimmons had sexually abused or was in danger of sexually abusing one or more girls, Westover failed and refused to report Fitzsimmons to child welfare authorities," *id.* ¶ 16. The Complaint goes on to allege that "[d]espite reasonable cause to believe that Fitzsimmons had sexually abused and/or was in danger of sexually abusing one or more girls, Westover failed and refused to suspend or terminate Fitzsimmons's employment, or to warn girls and their families of the risk of harm posed by Fitzsimmons, or to take any other steps to protect girls from his abuse," *id.* ¶ 17.

These several failures are characterized in Miranda's first claim for relief as actionable negligence on Westover's part. The Complaint then incorporates these 46 paragraphs as the factual predicates for the remaining three claims for relief – respectively, negligent infliction of emotional distress; recklessness; and intentional infliction of emotional distress.

Under the governing law in this case, discussed *infra*, the dispositive issue on this motion for summary judgment is the existence *vel non* of a genuine issue of material fact with respect to whether Westover knew or had reasonable cause to suspect that Allen Fitzsimmons was sexually

abusing Emily Miranda or exposing her to an imminent risk of sexual abuse.  If Westover lacked

such knowledge or cause for suspicion, it cannot be liable for any damage inflicted upon Emily by

Fitzsimmons' conduct while Emily was a student at the School, under any of the claims for relief

alleged in the Complaint.   If such knowledge or suspicion on Westover's part may be proven, the

School's liability may attach.

The parties defined by their pleadings that material fact, which determines Westover's

liability, and engaged in extensive discovery on that issue.  Emily Miranda was deposed.  So were

her parents, Karen and Raymond Miranda.  A number of Westover supervisors and  staff members

were deposed or gave written statements.

Defendant Westover now moves for summary judgment dismissing Plaintiff Emily Miranda's

Complaint.  Westover contends the evidentiary record shows there is no genuine issue about the

determinative material fact.  The evidence shows, Westover asserts, that at the pertinent times,

Westover had no knowledge of or reasonable cause to suspect Fitzsimmons' sexual abuse of Emily

Miranda,  or his  illicit propensity to abuse students.  It follows, Westover concludes, that the School

is entitled to judgment as a matter of law.

Plaintiff contends that triable issues of material fact exist which preclude summary

disposition.  This Ruling resolves Defendant's motion.

### III.  Standard of Review

Westover's motion for summary judgment is governed by Rule 56 of the Federal Rules of

Civil Procedure.

Rule 56(a) allows a party to move for summary judgment on "each claim or defense," or

"part of each claim or defense."  Fed. R. Civ. P. 56(a).   That subsection of the Rule then provides:

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.*

The Rule's adjectives are significant. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (citing Fed. R. Civ. P. 56(c)). "The mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." 550 U.S. at 380 (emphases in original) (citation, internal quotation marks, and brackets omitted).

Justice Scalia's opinion in *Scott v. Harris* describes the circumstances which prevent a factual dispute from being "genuine" for summary judgment purposes. "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Id.* (citation and internal quotation marks omitted). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id*.

The Supreme Court, reversing the Eleventh Circuit, applied that principle and granted a defendant police officer summary judgment, dismissing a civil rights action where the plaintiff's description of a high speed car chase was contradicted by a videotape of the incident. The case turned, the Court said, on "the factual issue [of] whether [the] respondent was driving in such fashion as to endanger human life." *Id.* With respect to that particular and decisive issue, Justice Scalia reasoned:

Respondent's version of events is so utterly discredited by the record

6

> that no reasonable jury could have believed him. The Court of Appeals should not have relied on such visible fiction; it should have viewed the facts in the light depicted by the videotape.

*Id.* at 380-81.

These principles govern consideration of the extensive evidentiary record in the case at bar.

## IV.  The Evidentiary Record in This Case

This Part of the Ruling considers the evidence, following discovery, on the issues of whether, at the time Emily Miranda was a student at Westover, the School knew that Allen Fitzsimmons, a School employee, had sexually assaulted Emily; or whether Westover had reasonable cause to suspect that Fitzsimmons was sexually abusing Emily or exposing her to an imminent risk of such abuse.  I will refer to the evidence that falls within several categories.

## A.  *Evidence of the Witnesses Particularly Involved in the Facts*

This sub-Part describes the evidence contributed by Plaintiff Emily Miranda; her parents, Karen Miranda and Raymond Miranda; and Ann Pollina, at the pertinent times the Head of Westover School.[1]

One notes at the outset that although the conduct between Fitzsimmons and Emily while Emily was a student at Westover caused Emily's parents to become concerned, the parents did not express that concern to Westover staff until after Emily had graduated from the school, in the spring of 2007.  The evidence probative of those facts is found in the deposition of Emily's mother, Karen Miranda; the deposition of Emily's father, Raymond Miranda; the deposition of Emily Miranda,

---

[1]  In years past, Pollina would have been called the "headmistress" of Westover.  Currently correct usage now designates the distinguished educators involved, of either gender, as "head of school."  Pollina signed herself in that manner in a letter in evidence, discussed *infra*.

herself; and the transcript of a telephone conversation between Ann Pollina, the head of Westover at the pertinent times, and an insurance company representative.  (Pollina is now deceased, and was not deposed in this case).

The depositions of Karen Miranda and Raymond Miranda took place in March 2021.  Doc. 42-1 to 42-3.  Emily Miranda was deposed in April 2021. Doc. 42-11, 50-9.   Ann Pollina's transcribed telephone conversation with the insurance agent took place in July 2012. Doc. 42-4.

Additional relevant evidence is derived from the parties' statements of undisputed facts on this summary judgment motion.

Emily Miranda entered Westover as a student in the fall of 2003 and graduated in the spring of 2007.  During part of those four years she was a boarding student, but for most of the time she lived at home.  Her father drove her to and from school each day.

I begin this description of the evidentiary record by considering in turn the evidence obtained from Emily Miranda's parents, Karen and Raymond Miranda; Ann Pollina, the head of Westover; and Emily Miranda herself.

1. **Emily Miranda's Parents**

At her deposition, Karen Miranda, Emily's mother, testified that in August of 2006, at the end of Emily's junior year at Westover, while Emily was living at home, Karen had intermittent trouble sleeping, and would get up at night to read.  Doc. 42-2,  at Transcript ("Tr.")  40.  Karen would hear Emily talking to someone on the house telephone.  Tr. at 40-41.  Emily said "it was a friend from school doing homework or something," *id.*  at  41; but Karen became suspicious, and by October 2006, at the start of Emily's senior year, Karen had become aware that Emily was talking on the telephone to Allen Fitzsimmons, a contact Karen Miranda regarded as inappropriate, *id.* at

8

42.

Karen Miranda testified that by October of 2006, Emily had become "angry," "volatile," "frightened," and "all kinds of emotions." *Id.* at 48. Emily told Karen that "she didn't have her period," and Karen asked Emily if she was pregnant. *Id.* at 49. Emily denied that she was. *Id.* Karen asked her: "What is going on with you and Allen?" and "[s]he denie[d] anything." *Id.* Notwithstanding that denial, Karen Miranda suspected that Emily's problematic conduct "had something to do with Mr. Fitzsimmons." *Id.*

Karen Miranda acknowledged in her deposition that during Emily's senior year at Westover, she did not inform Westover of her concern that Fitzsimmons was engaged in inappropriate conduct with Emily. Karen Miranda testified that during September and October of 2006, she did not report to the school her concerns about Fitzsimmons' conduct with Emily because "I did not want her to kill herself." *Id.* at 55. Karen was concerned that given Emily's troubled condition, "any exposure of the situation would cause Emily to take her life." *Id.* at 57. Karen also reasoned that reporting Fitzsimmons to the school could have led to Emily's departure from Westover; "[s]he never would have graduated" so that "[h]er life would have been altered." *Id.* at 59.

Karen Miranda testified that she and Raymond Miranda "showed up" without prior appointment at the campus office of Ann Pollina, the head of Westover, on the day after Emily graduated. *Id.* at 70-71. According to Karen, she related to Pollina "everything that Emily had told me about spending all the time" with Fitzsimmons. *Id.* at 71. Karen Miranda testified, with respect to her meeting with Pollina: "We asked her to remove him [Fitzsimmons] as a staff member to keep the other girls safe, to look into what had been done, to look into the emails, to look into their First Class chats." *Id.* at 73. Karen recalled Pollina as responding that "she would have to speak to her

lawyer." *Id.*

Raymond Miranda was deposed on March 18, 2021.  Doc. 42-3.  Raymond Miranda testified that while Emily was a student at Westover in 2006 to 2007, he knew that Emily and Fitzsimmons "were spending time together after hours, but was not aware that there was anything going on physically." Doc. 42-3, Tr. at 66.  Counsel for Westover put this question to Raymond Miranda: "At any point during that senior year before Emily graduates, did your concerns rise to the level where you thought you should have a discussion with somebody at the school?"  Tr. at 73.  Raymond responded:  "I believe Karen and I had a meeting with Ann Pollina, but that may have been after graduation.  I'm not sure."  *Id.*  In point of fact, evidence from other sources shows that Karen and Raymond Miranda met with Pollina the day after Emily graduated from Westover.  At their meeting with Pollina, the Mirandas criticized Fitzsimmons' conduct.  Raymond Miranda testified that he was dissatisfied with the outcome: "I don't remember details of the meeting, but we came out of there being disappointed.  And I do believe that he should have been fired on the spot.  And that didn't happen, so that didn't satisfy me." *Id.* at  74.

Raymond Miranda acknowledged, as did Karen Miranda, that the Miranda parents did not communicate their concerns to Westover until Emily graduated.  Raymond testified that during Emily's senior year at Westover, "I did not share anything with the school." *Id.* at  80.  Raymond Miranda had the same concern as did Karen: that raising the issue of Fitzsimmons' conduct during Emily's senior year would have deleterious effects upon her.  Raymond testified:

> Q.   Okay.  If you thought that during Emily's senior year that authorities needed to be contacted, do you think that's something you would have done?
>
> A.   I don't know.

Q.  What would your hesitation have been during that time period if you didn't notify the authorities?

A.   Just worry for her  – that she would be strong enough to go through something like this.

Q.   And with regard to strong enough, what specifically were your concerns?

A.  That it would be a very, very, very unpleasant experience for her.

*Id.* at  76-77.

In these circumstances, Karen and Raymond Miranda, the parents of Emily Miranda, the Plaintiff, decided not to communicate to Westover their concern about the conduct of Allen Fitzsimmons until Emily had completed her senior year and graduated from the School.  Consistent with that resolve, on the day after Emily graduated, the Miranda parents sought out Ann Pollina, the head of Westover, and had their meeting with her.

### 2.    Ann Pollina, the Head of Westover

The  nature and chronology of the Mirandas' communications with Westover are further evidenced by the account of Ann Pollina, then the head of school at Westover, concerning her meeting with the Miranda  parents.  That meeting occurred in June 2007, on the day after Emily graduated from the School.   Pollina's account is found in the typed transcript of a telephone interview of  Pollina, conducted on July 16, 2012 by an agent of Westover's insurance company.[2]  Doc. 42-4.

―――――――――――

[2]   Ann Pollina is deceased.  She was not deposed in this case.  The insurance agent who conducted the July 16, 2012 interview with Pollina asked at the conclusion,  "[H]ave all your answers been true and correct to the best of your knowledge?" and Pollina answered, "Yes."  Doc. 42-4, at 13.  The substance of Pollina's statements would, through one vehicle or another, including the testimony of the agent, be admissible at trial of the action.

Pollina's statement to the insurance agent recites that Karen Miranda, Emily's mother, spoke to Pollina in their meeting the day after Emily graduated from Westover.  According to Pollina's account of that conversation,  Karen  Miranda was "happy with . . . many things about Emily's time at Westover but one thing that . . . she was concerned about was her relationship with . . . this teacher," who was Allen Fitzsimmons. Doc. 42-4, at 6.   Karen Miranda "felt that the relationship was more than . . . what a faculty student relationship should be." *Id.*  Pollina asked what Karen was basing that on.  Karen "claimed that she had . . . overheard phone conversations and seen in e-mails that . . . just didn't sound as if it were an appropriate relationship." *Id.*   Pollina asked Karen Miranda "why she didn't tell me at the time." *Id.*  Karen's "response to that was that Emily she felt . . . was handling it." *Id.*  Pollina, pressing the point, asked if Karen "thought there was a physical relationship, and . . . her response was . . . no . . .  she didn't think that  there was anything physical about it but that she was unhappy with boundaries that were crossed." *Id.*   Pollina says "that was the first time that  I . . .  had heard that." *Id.*  According to Pollina, Karen Miranda "felt very strongly that . . . he [Fitzsimmons] shouldn't be at Westover.  That he needed to be gone from here." *Id.* Pollina "explained to her that I would have to look into it obviously." *Id.*  The meeting in Pollina's office then concluded.

Pollina stated further that during that meeting, Pollina told Karen Miranda that she [Pollina] was a mandated reporter, required by Connecticut statutory law to advise the state authorities of "anything that concerns me." *Id.* at 7. During the evening of the same day, Karen and Raymond Miranda came to Pollina's home and "conveyed the sense that . . . I couldn't report" what the Mirandas had told her about Emily and Fitzsimmons. *Id.*  Pollina immediately telephoned the School's attorney for advice about Pollina's responsibilities in the circumstances. *Id.*  Pollina

12

stressed that Karen Miranda "was claiming that [there] was not anything physical," anything  "over

and [above] the bounds,"  and continued:

> I could understand it being inappropriate without it being criminal
> um, in terms of the way she had been speaking. Um, and that's what
> I assumed. And I . . . I guess I assumed that partly because I couldn't
> imagine a parent who really thought that there was a physical
> relationship going on who would say nothing until after graduation
> Um, anyway um, I . . . I did not make a report [to the state authorities]
> at that point.

*Id.*

The report  Pollina acknowledged that she had in mind but did not make at that time was the

one required by Connecticut law, which the Complaint alleges "imposed upon the school a

mandatory duty to report to child welfare authorities if there was reasonable cause to believe that one

or more students were in danger of being sexually abused by an employee of the school." Doc. 1,

¶ 15.  Based on what Karen and Raymond Miranda  recounted to Pollina at the meeting in Pollina's

campus office, and later that evening at her home, Pollina discerned no basis for reporting to

Connecticut authorities that Emily Miranda was in danger of being sexually abused by Allen

Fitzsimmons.

The evidence does reveal, however, that Pollina was prompted by her discussions with the

Miranda parents in June 2007 to take certain other actions with respect to Fitzsimmons.  Pollina told

the insurance agent during the telephone interview in July 2012 that in the wake of Pollina's

discussions with the Miranda parents:

> I did call this young man in with the dean of students and his
> immediate supervisor, who was the athletic director[,] and I basically
> told him that if I ever heard any kind of rumor, substantiated or not,
> around boundary issues with him . . . again, it was gonna be big
> trouble, and secondly that . . . , he was to have no contact whatsoever

with this young woman [Emily Miranda].

Doc. 42-4, at 7.

Pollina said to the insurance agent that there "would certainly have been an ongoing conversation with him" [Fitzsimmons]. *Id.* at 8. In that regard. Pollina quoted in her statement a passage from a letter dated September 26, 2007, addressed to Fitzsimmons and signed by Pollina as head of school, as well as by the director of studies, the director of the athletic department, and the dean of faculty. The letter, generally favorable on the subject of Fitzsimmons' performance at Westover, contains this passage:

> You have faced several challenges. Because you are an attractive male working at a girls' school, you have to engage in difficult relations with students. You have learned the hard way that even when acting with the best intentions and trying to do what is best for a student, you must always work within the rules established by the school. Though you must continue to be especially diligent in keeping clear boundaries with students, your committee is confident that you have matured in this over the past two years. You have also improved considerably in keeping open the channels of communication with colleagues and administrators when difficult circumstances present themselves.

Doc. 50-7, at 3.

Thus encouraged, Allen Fitzsimmons continued as an employee of Westover School. The academic year 2007 to 2008 began. The stage was set for an event which fundamentally altered the development of the drama: Ann Pollina's second interview with a member of the Miranda family. This time, Emily Miranda came to Pollina's campus office. Emily's parents were not present.

### 3. Emily Miranda, the Plaintiff

One must now consider the account of these events given by the Plaintiff, Emily Miranda, in a deposition taken on April 13, 2021. Doc. 42-11.

14

Emily Miranda testified that her personal relationship with Allen Fitzsimmons began during her junior year at Westover School (the academic year 2005 to 2006).  Doc. 42-11, Tr. 90-93.  The relationship came to include frequent meetings *à deux* at the school, and telephone calls during the evenings or nighttime (Emily was then living at home).

A time came, Emily testified, when Emily and Fitzsimmons were talking on the phone, Karen Miranda "picked up the phone, it was late at night . . . . it was happening often enough that she wanted to know who I was on the phone with."  Tr. 115.  Karen eventually learned that her daughter Emily was having these nocturnal phone conversations with Fitzsimmons, a Westover faculty member.  Karen regarded that conduct as inappropriate.  Emily testified:

> Q.   [Y]our mother knew she had listened to a conversation and told you afterwards that it was inappropriate?
>
> A.   Correct.
>
> Q.   What did she do with that information as far as you know?
>
> A.   She told me that she wanted to tell Ann Pollina about it, the headmaster.
>
> Q.   Did she?
>
> A.   She did not.
>
> Q.   Why not?
>
> A.   My – I had a very strong reaction to that.  And I absolutely did not want her to do that and I kind of had a little bit of a breakdown. So, she agreed not to – not to say anything until after graduation, if at all.
> . . .
> A.   It was incredibly emotional and I can tell you that I probably would have killed myself.
>  . . .
> A. . . . I just remember it was a very clear and visceral reaction.  So

15

I don't know the words I said.  I just know that that's how – I walked away from that conversation feeling very clearly that that's what my course of action would be.

*Id.* at 121-22, 124, 134-35.

Emily Miranda's manifest distress had the desired effect upon her mother Karen.  Emily testified further:

Q.  It's clear to you that she [Karen Miranda] made no report to Westover, Department of Children and Family Services, police department, anyone else; correct?

A.  Not during my time at Westover.  Correct.

*Id.* at 135.

Emily described in her deposition three incidents of sexual contact with Fitzsimmons while she was a student at Westover.  *Id.* at 168-75.  The first occurred during a night in August 2006, the summer before Emily's senior year at the school.  *Id.* at 168-69.  Fitzsimmons came by Emily's home in his car, she "snuck out" of the house, she and Fitzsimmons parked at a nearby elementary school, placed a blanket on the grass, kissed for "a couple of hours," with groping, "but just over the pants." *Id.* at 169-70.  The second and third incidents occurred several weeks apart during Emily's senior year at Westover.  She and Fitzsimmons went into Fitzsimmons' office on the campus, where there was "more kissing and groping over the clothes." *Id.* at 172-73.

When one considers that Allen Fitzsimmons was an adult, a faculty member and an athletic coach at Westover School, and Emily Miranda was a teen-aged student entrusted to his care, Fitzsimmons' conduct was a quintessential example of that sort of sexual abuse the law condemns.

During these years,  Karen Miranda became concerned about Emily's night-time telephone calls with Fitzsimmons.  When Karen asked Emily about it, Emily was careful to hide those sexual

encounters from her parents.  Emily convinced her  parents "not to contact the school" at that time, and said of Fitzsimmons: "I told her nothing was happening between us."  *Id.* at 127.

Emily Miranda continued her deposition testimony by stating that her parents did not tell her in advance that they were going to arrange a conference with Ann Pollina.  Emily testified: "They didn't tell me they were going."  *Id.* at 158.  Asked by counsel, "You didn't know it had occurred until when," that "they had gone and reported to Ann Pollina about Mr. Fitzsimmons," Emily responded:  "They saw her the day after my graduation." *Id.* at 158.   On graduation day, Emily and the senior class left for a three-day visit "to somebody's house in New Hampshire,"  Emily and the senior class went for a three-day post-graduation visit, "and when I came home, they told me."  *Id.* Emily's parents told her that "we spoke with Ann Pollina," and "[y]ou two [Emily and Fitzsimmons] can't have any contact anymore."  *Id.* at 161.  Emily testified,  "I didn't say anything to them in response."  *Id.* at 159.

These events occurred in June of 2007.  Emily Miranda testified that while she was still a student at Westover, she "didn't think [Allen Fitzsimmons] was my boyfriend.  I thought he would be my boyfriend after graduation."  *Id.* at 144.  That fanciful thought by a seventeen-year-old girl reflects the cruelty of a faculty member's conduct with a student entrusted to his care.  However, Emily's perception of Fitzsimmons changed after she graduated from Westover and enrolled in college at Iona.  Emily had a phone conversation with Fitzsimmons during the fall of 2007 and another during the winter of 2008, and learned that Fitzsimmons "was going to continue on at Westover," which for Emily "was kind of the final piece of the puzzle for me that this wasn't real. . . . [I]n my head I . . .wanted him out of Westover."  *Id.* at 165, 167.

Emily reacted to that changed perception of Fitzsimmons by arranging a meeting of her own

17

with Ann Pollina, still the head of Westover.  Pollina's statement, Doc. 42-4, recites that following

her earlier meeting with Karen and Raymond Miranda in June 2007, where Emily's parents

expressed concern only with the extent of Fitzsimmons' non-physical contacts with Emily, Westover

contented itself with cautioning Fitzsimmons, a young male faculty member, about interactions with

female students, told him not to communicate separately with Emily, and retained Fitzsimmons on

the Westover staff.  Doc. 42-4, at 7-8.

### 4. Further Evidence from Ann Pollina

Pollina gives this account of what then ensued:

> So the next thing that happened was that in June 2008, almost a year
> later, Emily Miranda herself came to see me.
> . . .
> And said . . . , I know my mother spoke to you about . . . this
> relationship with, you know, . . . about . . . a relationship with Allen.
> . . . [A]nd I said, that's right, Emily, she told me she was worried that
> . . . you had . . . an inappropriate . . . that [you] were inappropriately
> close, closer than teacher and student could [*sic*, probably should read
> "should"] be but that there was nothing physical about it.  And she
> said to me that's not true. . . . [S]o that was in 2008.  And she
> described two situations in which he had kissed her in one and
> touched her on the leg in another.

Doc. 42-4, at 8-9.  Emily also gave Pollina copies of an e-mail exchange she had with Fitzsimmons,

and an emotional letter she sent him during the 2008 spring term.

Pollina described her reaction to Emily's disclosures at their June 2008 meeting:

> So what was clear to me number one, is that she had made an
> allegation of physical contact. . . . [A]nd number two, that . . . there
> had been . . . a[t] least a communication that I was not informed
> about.  So I double checked to make sure that nobody else had heard
> that this communication had been received . . . by him and they
> hadn't.

*Id.* at 9.  Pollina immediately reported the substance of Emily Miranda's report to the Connecticut

Department of Children and Family Services.[3]  *Id.*  She also decided that Fitzsimmons' employment by Westover would be terminated.  Pollina's statement says:

> . . .[A]t that point, it was pretty clear that he wasn't gonna be working at Westover . . . , and again regardless of the . . . results of the investigation I had a very clear understanding . . . with him that he was to report any communication with this young woman and he did not do that and simply on the basis of that . . . I withdrew his contract for the following year.

*Id.* at 10.

**B.**     ***Evidence of Other Witnesses Relied on by Defendant***

The careful reader will have noted that the statements of Emily Miranda, Karen Miranda, Raymond Miranda, and Ann Pollina agree on a fact of core importance: the members of the Miranda family (Emily and her parents) gave no notice to Westover that Allen Fitzsimmons' conduct with Emily was problematic in any manner, until *after* Emily had completed her senior year and graduated from the School.

That unanimity is consistent with the accounts of supervisors on the Westover staff at the pertinent times, whose evidence is also contained in the record.  Those individuals are Lizanne ("Tiz") Mulligan, the Westover Athletic Director, and Thomas Hungerford, Dean of Faculty, English teacher, chaplain and coach.  Mulligan and Hungerford  are no longer at Westover.  Mulligan testified in this case by affidavit [Doc. 42-6].  Hungerford also testified by affidavit [Doc. 42-8].

Mulligan, the former athletic director, recites in her affidavit that she was Allen Fitzsimmons'

---

[3]  Pollina's report to the state agency was followed by an investigation by the Middlebury, Connecticut police into Fitzsimmons' conduct with Emily Miranda, Emily's filing of a charge against Fitzsimmons, the arrest of Fitzsimmons in 2012 on a misdemeanor charge of reckless endangerment, his conviction on that charge on a plea of nolo contendere, and a sentence of one year in prison, execution suspended, and two years of probation.

direct supervisor. Doc. 42-6, ¶ 22.   During the relevant time period of 2004 to 2007, she never received any complaint from any Westover staff member or student that Fitzsimmons had sexually abused any student or anyone else, or had engaged in any type of inappropriate relationship with any Westover student. *Id.* ¶¶ 23-25.   Mulligan neither observed nor reported any inappropriate relationship between Fitzsimmons and a student. *Id.* ¶¶ 26-28.   Neither Emily Miranda nor her parents ever reported to Mulligan that Fitzsimmons had sexually abused Emily or was having an inappropriate relationship with her. *Id.*  ¶¶ 35-37.

Hungerford, the former dean of faculty, states in his affidavit that he had regular interactions with Fitzsimmons. Doc. 42-8, ¶ 10.   Hungerford never received complaints from any Westover student that Fitzsimmons was sexually abusing her. *Id.* ¶ 16.   Emily Miranda and her parents never made such a complaint to Hungerford. *Id.* ¶¶ 32-34.   Hungerford did receive "complaints about Allen  Fitzsimmons' professional demeanor and attitude," investigated and reported them to Ann Pollina, and stated that "[n]either I nor Ann Pollina believed that any of the complaints about Allen Fitzsimmons' demeanor and attitude rose to the level necessary of disciplinary action." *Id.*  ¶¶ 12-15.  Nothing further was done with respect to those complaints.

It should also be noted that no Westover staff member ever reported having witnessed Fitzsimmons behaving in a sexually abusive manner with Emily Miranda or any other student. Fitzsimmons' first sexual contact with Emily, night time kissing and groping in a parked car, occurred after Emily sneaked out of her home.  The other two incidents described in Emily's deposition occurred unwitnessed in Fitzsimmons' campus office, behind a closed door.

After Emily Miranda had graduated from Westover and her parents had arranged their meeting with Pollina and expressed concern about Fitzsimmons, in the manner recounted *supra*,

Pollina followed up in consultation with Mulligan and Hungerford.  Pollina's statement says that she

regarded the Miranda parents' concerns as "a red flag," and continues:

> [A]nd I did call this young man in with the dean of students and his
> immediate supervisor, who was the athletic director and I basically
> told him that if I ever heard any kind of rumor, substantiated or not,
> . . . around boundary issues with him . . . again, it was gonna be big
> trouble and secondly that . . . he was to have no contact whatsoever
> with this young woman.
> . . .
> [T]hat . . . if she made any attempt to contact him he needed to
> immediately tell one of the three of us that that (sic) had happened . .
> . .

Doc. 42-4, at 7.

The evidence shows that during the discussion Karen and Raymond Miranda had with Ann

Pollina in June 2007, the Miranda parents did not mention Fitzsimmons' sexual contacts with Emily.

That is because at that time, Emily was concealing those aspects of Fitzsimmons' conduct from her

parents.

As noted *supra*, the evidence also shows that further contacts subsequent to June 2007

occurred between Fitzsimmons and Emily Miranda, which Fitzsimmons did not report to his

Westover superiors despite Pollina's instructions to Fitzsimmons that he do so.  Because of that

failure, Pollina terminated Fitzsimmons' employment at the School.

## C.  *Evidence Relied on by Plaintiff*

Plaintiff Emily Miranda is the master of her Complaint and the theory of her action against

Westover School.  The Complaint alleges that "[*p*]*rior to and during Emily's attendance* at

Westover,"  Westover knew or should have known that Allen Fitzsimmons was a sexual predator

and child molester who preyed on Westover students.  Doc. 1, ¶ 11 (emphasis added).  The timing

of Westover's knowledge about Fitzsimmons' propensities is determinative of Westover's liability for whatever damage Fitzsimmons' conduct may have inflicted upon Emily. On Plaintiff's theory of the case, that knowledge, actual or constructive, must have predated Emily's graduation from Westover.

In its motion for summary judgment, Westover contends the evidence shows that Westover supervisors had no knowledge of Fitzsimmons' propensity to sexually abuse students until Emily recounted her experiences with him in a meeting with Ann Pollina, which occurred a year after Emily graduated from Westover. Ms. McNamara, counsel for Westover, began her oral argument on the motion by stating that during Emily's attendance at the school, "Westover lacked the requisite notice," and went on to explain why that was so. Doc. 57, at 11-38.

Mr. Ponvert, counsel for Plaintiff, in a spirited but relatively brief response, said "I'm going to make it quite short." *Id.* at 38. He then verbally brandished a letter from Westover School to the "Westover Community" which counsel characterized as an "actual admission by the two most senior members of the [school's] organization." *Id.* at 40. In Mr. Ponvert's submission, "the admission made in the school's own letter . . . stands alone as enough evidence to get past the motion." *Id.*

The letter to which counsel referred is Doc. 50-2 in the record, an exhibit to Plaintiff's brief in opposition to the present motion [Doc. 50]. The letter, on Westover School stationery, addressed to the "Westover Community," is dated August 11, 2020, and signed by Julie Faulstich, Head School, and Starr White Snead, President of the Board of Trustees ("the August 2020 Letter"). Doc. 50-2, at 1, 6. The Letter states preliminarily: "In the wake of reports over the last few years of sexual abuse at a number of boarding and day schools, Westover School conducted an internal review of

our records to identify any past allegations of abuse." *Id.* at 1.  The school also retained an outside

attorney to conduct an investigation.  *Id.*  The August 2020 Letter then describes a number of

incidents at Westover.  I quote the passage pertinent to the case at bar; the parties agree that the

unidentified "alumna" referred to is in fact Emily Miranda:

> One alumna credibly reported that, between approximately 2005 and
> 2007, Allen Fitzsimmons, a squash coach and history teacher at
> Westover from 2004 to 2008, sexually abused her when she was
> approximately 16 to 17 years old.  There is evidence that some faculty
> suspected and/or were aware of allegations that Mr. Fitzsimmons was
> engaging in an inappropriate relationship with this alumna.  In 2008,
> the alumna, a year after she graduated, notified the Head of School
> directly of this sexual misconduct.   The School reported this
> allegation to the appropriate authorities and terminated Mr.
> Fitzsimmons.

*Id.* at 2.

Plaintiff's counsel, opposing the Westover summary judgment motion, understandably gives

pride of place to the school's August 2020 Letter, signed jointly by the then head of school and

board chairperson.  However, the question is whether this letter is a vessel sufficiently seaworthy to

transport the cargo Plaintiff loads in her holds.

Plaintiff's counsel characterizes the August 2020 Letter as an "admission" by Westover's

principal officers.  "Admission" is a significant noun in the language of the law.  An earlier version

of Federal Rule of Rule of Evidence 801(d)(2) excluded from hearsay *inter alia* the "admissions"

of a party opponent.  However, the 2011 amendments to the Rule omitted the word, for the reasons

the Advisory Committee stated in its Notes:

> Statements falling under the hearsay exclusion provided by Rule
> 801(d)(2) are no longer referred to as "admissions" in the title to the
> subdivision. The term "admissions" is confusing because not all
> statements covered by the exclusion are admissions in the colloquial

> sense — a statement can be within the exclusion even if it "admitted"
> nothing and was not against the party's interest when made.

Fed. R. Evid. 801 advisory committee's note ( 2011 Amendment).

Notwithstanding these linguistic vapors, the noun survives in the Federal Rule of Civil Procedure. Rule 56(c)(1)(A) provides that on a motion for summary judgment, a party "asserting that a fact cannot be or is genuinely disputed must support the assertion" by citing to "particular parts of materials in the record," including *inter alia* "stipulations . . . , *admissions*, interrogatory answers, or other materials." Fed. R. Civ. P. 56(c)(1)(A) (emphasis added). Rule 36 provides for discovery by means of "requests for admission." *Id.* 36.

I accept that Defendant Westover's August 2020 Letter was an "admission" within the scope of these Rules, binding upon the Defendant as far as it goes. However, within the context of Westover's present motion for summary judgment, the Letter does not go very far in accomplishing its professed purpose of demonstrating the existence of a genuine factual issue precluding summary judgment for the Defendant.

As noted, this case turns on whether Westover supervisors had knowledge [knew or should have known] of Allen Fitzsimmons' sexual abuse propensities during the time Emily Miranda was a student at the school, being abused by Fitzsimmons. That is the decisive fact. The August 2020 Letter was signed by Julie Faulstich and Starr White Snead. In addition, both testified by deposition: the transcripts are in the record as Doc. 50-3 (Faulstich) and Doc. 50-5 (Snead).

Faulstitch joined the Westover community on July 1, 2015, as head of school, having been hired from the outside. Doc. 50-3, at 3-4. Snead graduated from Westover in 1969, served on the board of trustees and became board chair in 2016, but was not on campus after 1969, and "can't

really speak to what was going on – how things were parsed out at the school." *Id.* at 8.   Neither Faulstich nor Snead have personal knowledge concerning the decisive fact of Westover supervisors' knowledge *vel non* about Fitzsimmons' propensities and conduct while Emily was a student.   Their execution of the August 2020 Letter fails to satisfy the lenient definition of relevance in  Federal Rule of Evidence 401:  "Evidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

The Court must examine the August 2020 Letter to determine its probative value with respect to the decisive factual issue in the case.

The passage relied upon by Plaintiff's brief begins by saying: "One alumna credibly reported that, between approximately 2005 and 2007,  Allen Fitzsimmons, a squash coach and history teacher at Westover from 2004 to 2008, sexually abused her when she was approximately 16 to 17 years old." Doc. 50-2, at 3.  The alumna referred to is Emily Miranda herself, and the evidence shows that Emily did not report Fitzsimmons' abusive conduct until she told head-of-school Pollina about it during a meeting Emily requested in June 2008, a year after she graduated from Westover.  Given the timing of that "alumna's credible report" to Pollina, the report does not, contrary to Plaintiff's suggestion, constitute probative evidence that Westover knew of Fitzsimmons' propensities while Emily was still a student; rather, the evidence precludes a finding in Plaintiff's favor on that particular point.

Plaintiff also relies upon this statement in the August 2020 Letter: "There is evidence that some faculty suspected and/or were aware of allegations that Mr. Fitzsimmons was engaging in an inappropriate relationship with this alumna." *Id.*  Plaintiff characterizes this statement in the Letter

as an admission by Westover that "there is evidence that some faculty suspected and/or were aware of allegations that Fitzsimmons was engaging in an inappropriate relationship with Emily." Doc. 50 ("Plaintiff's Brief"), at 4.  If Plaintiff means by this argument to suggest that "some faculty suspected or were aware of allegations" that Fitzsimmons was sexually abusing Emily Miranda while Emily was still a student at Westover, I do not agree that the evidentiary record supports that proposition.

The August 2020 Letter does not identify those suspicious or aware faculty members, and does not attach or quote from any reports they may have made at the pertinent time.  Plaintiff's Brief clarifies the question.  Doc. 50, at 5-9.  In Plaintiff's submission, the individuals in question are Lawrence O'Brien, who from May of 1997 to March of 2008 was a security officer and softball coach at Westover, and Zachary T. Lytle, who from 2002 to 2010 was the visual arts teacher and artist-in-residence at Westover.  Both O'Brien and Lytle have been deposed in this action.  On Westover's present motion for summary judgment, the parties submit carefully selected pages from those depositions.  By means of cross-reference and cross-reading, the Court is able to discern the full substance of these witnesses' testimony.

O'Brien testified pursuant to a notice of deposition served by Plaintiff.  Counsel began by asking O'Brien if he remembered "a student named Emily Miranda." Doc. 50-4, at 3.   O'Brien responded "Yes."  *Id.*  Counsel then asked: "Did you have some, either from what you observed or things that you had heard, did you ever have a concern about whether Mr. Fitzsimmons was behaving sexually inappropriately with Emily?"  O'Brien responded: "[n]ot with Emily in particular, no.  I did have other suspicions."  *Id.*  O'Brien went on to explain that when he was the softball coach, "at the time Emily was there," Fitzsimmons "used to hang around quite a bit, it was kind of creepy," after the practices "he had a few that would stay behind and speak with and sometime leave with to go

to, pizza, ice cream, is what I was told." *Id*. at 3-4.  O'Brien told Fitzsimmons that "I really rather

you don't attend my practices or, you know,  talk to my girls after," but Fitzsimmons' conduct

continued to irritate O'Brien, who eventually twice reported the situation to Mulligan, the athletic

director *Id*. at 4.  O'Brien said to Mulligan: "'The situation was not improving, he's still hanging

around,' and I felt it was very inappropriate." *Id*.

O'Brien told Mulligan that "he's still hanging around practices, he's taking some of the girls

after practice and doing, whatever, you know, activities.  And I thought it was very inappropriate and

I didn't want him back." *Id*. at 6.  Counsel asked specifically if O'Brien had "a concern that Allen

Fitzsimmons was violating some boundaries with one or more of these girls, in terms of sexual

behavior?" *Id*.  O'Brien responded:  "I've been in law enforcement and security for almost 40 years,

and I think I read people pretty good, he was just not a good person.  He was really, really creepy,

that's my best word to assign to him." *Id*.  O'Brien concluded his response: "I had suspicions but

nothing substantiated, no." *Id*. at 7.

On cross-examination, counsel for Westover put it to O'Brien: "[Y]ou said a couple of times

that after your softball practice Allen Fitzsimmons would take two or three or four girls to do other

activities; do you know what the activities were that he did? " Doc. 42-21, at 22.[4]   O'Brien

responded: "Just from what I was told, I was told he would take them out for ice cream, he would

take them out  for pizza.  You know, something innocent.  I'm not implying anything happened."

*Id.*  O'Brien acknowledged reporting this conduct by Fitzsimmons to Mulligan. *Id.* at 20.  Counsel

followed up by asking: "[I]s it fair to say, there was nothing concrete that you could report or felt

---

[4] Defendant also filed excerpts of the O'Brien deposition as Exhibit 21 at Doc. 42-21.  The
Court references the page numbers of the document as filed by the Court, as opposed to the internal
transcript page numbers.

comfortable reporting to someone in authority, like Officer Desmarais?"[5]   O'Brien responded: "Correct," and continued:

> And, again, I did not have any of this knowledge until after the incident was reported to Emily's parents and the parents reported it to the school.  I was not aware of anything going on, at all, before that time.

*Id.* at 20.  O'Brien had previously been asked: "When you went to confront Mr. Fitzsimmons about showing up at your practices, did you have any discussion with him about Emily and your suspicions?"  *Id.* at 17.   O'Brien responded: "It was not about Emily, no. . . . I had no suspicions about Emily at that time at all."  *Id*.

Plaintiff also took Lytle's deposition. Doc. 50-10.  Lytle testified that he was the Westover faculty advisor of a student named Alana Vogel, a classmate of Emily Miranda, who he described as "Emily's best friend."  *Id.* at 4.  Lytle testified that Alana "started hinting to me that she thought there was something inappropriate going on" between Allen Fitzsimmons and Emily.  *Id.*  Lytle added that at a time "when Alana already had me concerned that possibly something inappropriate was going on," he observed Fitzsimmons and Emily playing a video game in a large open room in the school gymnasium building.  *Id.* at 5. They "each had one leg up on a chair, that was in front of the two chairs that they were sitting on," *id*.; and  "I don't know if I can say that their legs were like intertwined, I think I can say they were both up on the same table and that kind of made me uncomfortable, or kind of ticked me off, I guess, because I felt like it was, it looked like what Alana had been describing, maybe," *id.* at 6.   Lytle continued:

---

[5]   Officer Desmarais was a member of the local police force, to which Westover reported Fitzsimmons' abuse of Emily Miranda after Emily reported it to Pollina, a year after Emily graduated from the school.

> "[T]hat's what ticketed [sic] me off.   Something seemed
> inappropriate about it, whether their legs were over each other, or
> under each other, or whether they were just . . . it just seemed . . . I
> don't . . . you know, it was definitely bright out, it was midday, they
> were out in the open.  So, I mean, I guess . . . I don't know, there was
> just still something that seemed weired [sic] about it.  But that was
> probably because I knew that Alana was really worried about the two
> of them having some sort of inappropriate relationship and I felt like
> at that point it seemed like he was kind of flaunting it . . . .

*Id.* at 7. Counsel asked if this transpired in "a public space at the school." *Id.*  Lytle responded:

"Commonly people would be walking through, so they were definitely not trying not to hide." *Id.*

(quoted as it appears in the original, but the second "not" is probably an error).

Whatever ruminations Lytle may have entertained about a possible relationship between

Allen Fitzsimmons and Emily Miranda, he made no report on the subject to his superiors at

Westover.

At the end of his deposition, Lytle had this exchange on cross-examination by counsel for

Westover:

> Q.  Did you ever personally witness Mr. Fitzsimmons doing anything
> that you thought was reportable under the standards that you know of
> today?
>
> A.  No.
>
> Q.  Okay.
>
> A.  Even today, like even today, it would be tricky.
>
> Q.  It would be, even today it would be tricky to report anything?
>
> A.  Even today.  Well, it's easy in hindsight based on, you know, we
> know this happened, right, but even today if I were given the same
> information by a student, I'm not saying I wouldn't report it, but it
> would be tricky, I would still feel like I was reporting rumors.

29

Doc. 42-19, at 11.   On re-direct examination of Lytle by counsel for Plaintiff this exchange occurred:

> Q.  If a student came to you today and told you exactly what Alana told you about Emily and Allen, what would you do?
>
> A.  Report it.

Doc. 50-10, at 12.

I am not certain that Lytle's last quoted answers are wholly reconcilable.

## V.  Applicability of the Governing Law to the Evidentiary Record

The question presented on this motion is whether this evidentiary record entitles Defendant Westover to summary judgment dismissing Plaintiff Emily Miranda's Complaint, which alleges that Westover is liable for the sexual abuse Allen Fitzsimmons inflicted upon Emily.

To reiterate: For a court to grant summary judgment, the movant must "show [ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).[6]

Analysis of a motion for summary judgment begins with the identification of what the material facts are. The inquiry is case specific. For the case at bar, there is no shortage of instructive appellate decisions. It is a sad commentary on contemporary culture that employers are frequently called upon to pay damages to victims of sexual abuse perpetrated upon them by employees. Such claims come to trial courts from schools, churches, and boy scout organizations, traditional havens

---

[6] The Court notes that in 2010, Rule 56(a) was amended, "changing only one word – genuine 'issue' bec[ame] genuine 'dispute.'" Fed. R. Civ. P. 56(a) advisory committee notes (2010 Amendment). According to the Advisory Committee, " '[d]ispute' better reflects the focus of a summary-judgment determination." *Id.*

of growth and sanctity whose ranks of teachers, priests, and troop leaders include with distressing frequency sexual predators.  The instant case is illustrative.  Plaintiff Emily Miranda sues Defendant Westover School for damages she suffered as the result of sexual abuse inflicted upon her by Allen Fitzsimmons, a Westover employee, while Emily was a student at Westover.

The action falls within this Court's diversity jurisdiction.  The briefs of counsel cite Connecticut cases throughout.  Connecticut substantive law may properly be regarded as controlling in this case, where Westover School is a Connecticut corporation, conducted its educational functions in Connecticut, Emily Miranda was a Connecticut resident when she attended Westover, and the non-party's conduct complained of occurred in Connecticut.

Connecticut appellate decisions define the core issue of fact in determining an employer's liability for an employee's sexual misconduct inflicted upon a third party.  I find particularly instructive the decisions of the Connecticut Supreme Court in *Doe v. Town of Madison*, 340 Conn. 1 (2021), and the decisions of the Connecticut Court of Appeals in *Gough v. Saint Peter's Episcopal Church*, 143 Conn. App. 719 (2013); *Salamone v. Wesleyan University*, 210 Conn. App. 435 (2022); and *Doe v. City of New Haven*, 214 Conn. App. 553 (2022).

In *Gough,* the plaintiff, while a teenager serving as an acolyte at Saint Peter's, a parish church, was sexually abused by one Bruce Jacques, a priest employed by the church.  Plaintiff sought to hold the church and the governing diocese liable for the abusive priest's conduct.  The trial court granted summary judgment to the defendants.  The trial judge reviewed the evidence, consisting of depositions and affidavits, and concluded that "the undisputed evidence establishes that those who knew Jacques before and during his service at St. Peter's had no knowledge, no suspicion and no basis for any knowledge or suspicion that Jacques had abused or would abuse anyone."  143 Conn.

31

App. at 727 (quoting trial court's opinion).  It followed, the trial court reasoned, that "there is no genuine issue of material fact concerning whether the defendants should have anticipated the harm of the general nature of that suffered was likely to result. . . . In other words, it was not reasonably foreseeable to the defendants that Jacques would abuse the plaintiff." *Id*.  The trial court then held that "[although] there may be a fiduciary relationship between the parties, absent a basis for knowing Jacques posed a risk of harm, neither St. Peter's nor the [d]iocese violated any fiduciary duty to the plaintiff. . . . Therefore, summary judgment is granted to the defendants as to [all] counts." *Id*.

The Connecticut Court of Appeals confirmed this judgment in *Gough*.  Construing the Connecticut decisions, it held: "The crux of the present appeal is whether the defendants owed a duty to the plaintiff.  The dispositive question, therefore, is whether the specific harm alleged by the plaintiff was foreseeable to the defendants. . . . [T]hat inquiry is whether St. Peter's and the diocese knew or should have known that Jacques had or would abuse the plaintiff." *Id.* at 730.  The court of appeals observed that plaintiff "did not disclose to anyone that the incident occurred until decades later," *id.* at 731-32, and held:

> Without any specific facts that reasonably could give rise to an inference that the sexual abuse of the plaintiff was the foreseeable result of any act or omission by the defendants, the plaintiff's allegation that the defendants knew or should have known that Jacques had or would harm the plaintiff is unsupported. Thus, it cannot survive a motion for summary judgment. We therefore conclude that the harm that Jacques inflicted on the plaintiff was not foreseeable and, accordingly, that the court correctly determined that there was no genuine issue of material fact as to whether the defendants owed the plaintiff a legal duty.

*Id.* at 732.  (citations and footnote omitted).

Eight years later, the Supreme Court of Connecticut decided *Town of Madison*, 340 Conn. 1 (2021). The plaintiffs in *Madison* were three male high school students who had been sexually abused by a female high school teacher, one Allison Marchese ("Allison"). Plaintiffs sued to recover damages from the town, the board of education, and the high school principal. Plaintiffs' case against those defendants turned on whether the defendants suspected Allison was sexually abusing the students, thereby triggering defendants' ministerial duty to report suspected child abuse to state authorities under Connecticut's mandatory reporting statute.

It is this reporting statute that Emily Miranda, the Plaintiff at bar, alleges Westover violated in failing to report Allen Fitzsimmons – a failure Miranda includes in her first claim of negligence against Westover. Connecticut court decisions regard the reporting statute as imposing a ministerial duty upon school authorities. Decisions which construe the reporting statute and adjudicate claims it was violated are directly in point with the case at bar.

After extensive discovery, the trial court in *Madison* rendered summary judgment in favor of all defendants. The trial court reviewed the record and held that "there was no evidence to provide any of the high school staff members with the requisite 'reasonable cause to suspect' that Allison was sexually abusing the plaintiffs." 340 Conn. at 16.

On appeal to the Connecticut Supreme Court, the plaintiff students contended that "there was a genuine issue of material fact with respect to whether the defendants breached their ministerial duty to report a reasonable suspicion of child abuse, as imposed by the mandatory reporting statute and the board reporting policy." *Id.* at 20. The Supreme Court reviewed the evidentiary record independently and affirmed, stating, "[W]e conclude that the trial court correctly determined that, on the facts in this record, none of the high school personnel had reasonable cause to believe that

Allison was sexually abusing any of the plaintiffs or exposing them to an imminent risk of sexual abuse." *Id.* at 30.

The Connecticut Supreme Court's holding in *Madison* is instructive in the case at bar because of the cases' significant similarities.  First:  In *Madison*, "although all of the teachers and coaches who testified at depositions in these cases agreed that it would be inappropriate and reportable misconduct for a teacher to flirt with a student, none of those teachers or coaches ever witnessed Allison flirting with a student, including any of the three plaintiffs."  *Id.* at 25.  Construing the verb "flirt" to describe conduct of a sexual nature,[7] as the Supreme Court's opinion in *Madison* clearly intended, there is a comparable absence of proof in the case at bar that Westover staff observed sexual misconduct by Fitzsimmons,  directed at Emily Miranda or any other student.

Second: A plaintiff in *Madison,* seeking to remedy the absence of direct proof of a defendant's knowledge of an employee's abusive conduct, "identifies a seventeen fact chain that, he argues, would suggest that people at the school should have known what was happening with the plaintiffs," *id.* at 26-27, that is, Allison was sexually abusing them.  At this point in the text, the *Madison* Court inserts a lengthy footnote, which identifies seventeen facts that plaintiff "claims establish reasonable cause to suspect that Allison was sexually abusing him." *Id.* at 26 n. 24.  Those factual incidents include the manner in which Allison dressed, the number of times she pulled this plaintiff out of class to confer with him in her office, and conversations or remarks by Allison and others at various times and in various circumstances.  *Id.*

The plaintiffs in *Madison*  contended that the cumulative effect of these incidents compelled

---

[7]  The Merriam-Webster Online dictionary (visited August 15, 2022) defines "flirt" as "to behave amorously without serious intent."

34

an inference of illicit sexual conduct on the part of Allison.  In the case at bar, Plaintiff Emily

Miranda seeks to draw the same inference from the observations and testimony of two Westover

employees, O'Brien and Lytle.

In *Madison*, the Connecticut Supreme Court refused to draw that inference, in circumstances

which resemble those of the case at bar.  The *Madison* Court's reasoning is worth quoting at some

length:

> We agree with the trial court that this piling of inferences distorts the
> actual reality apparent to the various employees in real time.  By
> aggregating the facts as they do, the plaintiffs impermissibly attribute
> knowledge of all of the facts to each of the high school's employees.
> As the plaintiffs themselves agree, each defendant must be judged on
> the basis of only those particular facts known to that person.  Put
> differently, aggregating the seventeen facts to create reasonable cause
> to suspect sexual abuse or imminent risk thereof is akin to charging
> the various high school employees with the responsibility of viewing
> a completed jigsaw puzzle, when all any of them could see at any
> relevant time was a piece or two.

*Id*. at  27-28 (citations and internal quotation marks omitted).

The Connecticut Supreme Court in *Madison* evaluated the evidentiary record, and concluded

that "there is no evidence to support reasonable cause for any of [the high school] employees to

suspect that Allison was sexually abusing the plaintiffs or exposing them to an imminent risk of

sexual abuse by her."  *Id.* at 23.  In consequence, the trial  court's grant of summary to judgment to

defendants was affirmed.

In *City of New Haven*, 214 Conn. App. 553, an adult female high school teacher named

Frechette sexually abused a teen-aged male student.  This conduct was observed and reported by a

school security guard.  The student and his parent sued the city board of education and the high

school principal, on the theory that certain circumstances, "taken together, were enough to create a

35

reasonable suspicion of imminent abuse." 214 Conn. App. at 568.  The trial court granted summary judgment to those defendants.

The Connecticut Court of Appeal affirmed, citing and quoting the Supreme Court's opinion in *Madison*, considering the totality of the evidence, and concluding that "the plaintiff has failed to establish the existence of a genuine issue of material fact regarding whether the defendants had knowledge or reasonable cause to believe that Frechette had abused or was imminently likely to sexually abuse a student prior to the date on which a report was made." *Id*. at 573-74.

In *Wesleyan University*, 210 Conn. App. 435, the plaintiffs were minor children who sued Wesleyan for sexual assaults inflicted on them in a campus dormitory by one Barer, a university student and head advisor and resident in the dormitory.  Plaintiffs argued that "because a college student brings three individuals who are younger than college age onto campus, that should give rise to the notice and foreseeability that unacceptable conduct would occur." 210 Conn. App. at 449 (ellipsis omitted).  The Connecticut Court of Appeals, affirming the trial court's grant of summary judgment in Wesleyan's favor,  rejected that contention by plaintiffs.  The court reasoned:

> In the absence of evidentiary support, this bald assertion was insufficient to create a material issue of fact as to whether the defendant's conduct created an unreasonable risk that Barer would bring young teenage boys to his dormitory room and sexually assault them. Because the plaintiffs made no showing of evidentiary facts or presented any evidence outside the pleadings from which material facts alleged in the pleadings can be warrantably inferred as to whether the defendant knew or should have known of the risk to the plaintiffs in this case, the court properly rendered summary judgment in favor of the defendant.

*Id*.

These appellate decisions articulate the governing Connecticut substantive law on the issues

presented by Plaintiff Emily Miranda's suit against the Defendant, Westover School.  I apply that law to the evidentiary record in this case, and conclude that Westover is entitled to summary judgment dismissing Plaintiff's Complaint.

The evidentiary record shows that Westover administrators had no direct knowledge that Allen Fitzsimmons was sexually abusing Emily Miranda, a student at the School, until a year after Emily graduated, when she told Ann Pollina the abuse had previously occurred.  Nobody in authority at Westover had actual knowledge about this abuse while Emily was a student and the abuse was taking place.  That is the testimony of all the witnesses involved.  There is no contrary evidence.  It follows that under the cited decisions, this case turns upon whether Plaintiff can show that even in the absence of such knowledge,  at the time Emily was a student at Westover those in authority at the School had reasonable cause to suspect or believe that Fitzsimmons was assaulting Emily, or was exposing Emily to an imminent risk that he would do so.  That is the decisive material fact in the case.  If the evidentiary record  reveals that there is no *genuine* issue of that fact, so that no reasonable jury could decide it in Plaintiff's favor, then Westover is entitled to summary judgment.

It is established that Allen Fitzsimmons, a Westover employee, sexually abused Emily Miranda while Emily was a student at Westover.  The liability of Fitzsimmons for that conduct is not at issue in this case.  At issue is *Westover*'s  liability for Fitzsimmons' abuse of Emily.  Westover is liable for that conduct by Fitzsimmons only if, during Emily's attendance at the school, Fitzsimmons' wrongful conduct was foreseeable by Westover.  That foreseeability depends in turn upon whether Westover knew or should have known that Fitzsimmons would harm Emily.

If Westover lacked that knowledge, actual or constructive, then Fitzsimmons' harmful conduct was not foreseeable by Westover, Westover did not owe Emily a legal duty to prevent that

harm, and Westover is not liable in law for the damage Fitzsimmons' conduct inflicted upon Emily. The Connecticut courts in *Gough* and *Madison* granted summary judgment to the defendant employers because the plaintiff victims of an employee's illicit action produced no specific facts supporting the proposition that the employee's abusive sexual conduct was reasonably foreseeable by the defendant. Defendant Westover moves for the same disposition in the case at bar.

The Connecticut Supreme Court's reasoning in *Madison* is consistent with the United States Supreme Court's declaration in *Scott v. Harris* that "[a]t the summary judgment stage," where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is 'no genuine issue for trial'" and summary judgment should issue. 550 U.S. at 380 (quoting *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)).

Summary judgment practice in the Second Circuit is well established. Specific guidance is furnished by the Second Circuit's opinion in *Robinson v. Concentra Health Services*, 781 F.3d 42 (2d Cir. 2015):

> While it is true that a court is required to resolve all ambiguities and draw all factual inferences in favor of the nonmovant, a plaintiff may not survive summary judgment merely by conjuring a hypothetical issue of material fact. Where the moving party demonstrates the absence of a genuine issue of material fact, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact. More specifically, it must do more than simply show that there is some metaphysical doubt as to the material facts, and may not rely on conclusory allegations or unsubstantiated speculation.

*Id.* at 44 (citations and internal quotation marks omitted).

We may trace the effect of these principles upon the case at bar. Westover demonstrated the absence of a genuine issue on the material fact of Westover's lack of actual knowledge of

Fitzsimmons' predatory propensity while Emily Miranda was a student at Westover, that being the pertinent time in the case. Westover made that demonstration principally through the evidence obtained from Emily Miranda, her parents Karen and Raymond, and Ann Pollina, the head of school. Notably, the record shows Pollina did not deal with Fitzsimmons' predatory conduct after her meeting in June 2007 with the Miranda parents because the parents said nothing about such conduct, not surprising since at that time Emily had not told her parents about her behavior with Fitzsimmons. Pollina did not learn of Fitzsimmons' sexual abuse of Emily until Emily told Pollina about it in June 2008, and Westover terminated Fitzsimmons' employment shortly thereafter.

This undisputed lack of actual *knowledge* leaves Plaintiff in the position of having to argue that Westover had reasonable cause to *suspect* Fitzsimmons was a predator. Plaintiff is required, in the wording of *Robinson*, to "come forward with specific evidence demonstrating the existence of a genuine dispute" with respect to that material fact. 781 F.3d at 44. Plaintiff cannot make that showing by relying on "metaphysical doubts," "conclusory allegations," or "unsubstantiated speculation." *Id.*

In the latter regard, *Gough* holds that a plaintiff's allegation that a defendant "knew or should have known" another individual would harm the plaintiff is disregarded as "unsupported" if made "without any specific facts that reasonably could give rise to an inference" that such harmful conduct would occur. 143 Conn. App. at 732. That holding resonates in the case at bar because Emily Miranda bases her claim against Westover on the allegation that Westover "knew or should have known" Fitzsimmons had a propensity to sexually abuse her. Under the Connecticut appellate decisions cited *supra*, Defendant Westover's proof cast upon Plaintiff the burden of coming up with "specific facts that reasonably could give rise to an inference that the sexual abuse" of Emily

Miranda by Fitzsimmons was the foreseeable result of Fitzsimmons' known conduct.

Plaintiff at bar fails to make that showing.  She relies principally upon the deposition testimony of the two former Westover staff members, O'Brien and Lytle.  The briefs of counsel, exercises in advocacy, quote selectively from those depositions.  Plaintiff extracts from that testimony passages or nuances which are said to support an inference that Fitzsimmons was a sexual predator whose presence endangered students.  The effort is not persuasive.  While both O'Brien and Lytle were critical of certain aspects of Fitzsimmons' conduct, neither of them felt it necessary to report to higher Westover authority that Fitzsimmons was an actual or likely sexual predator.  The record in this case resembles that in *Madison*, where the student plaintiff unsuccessfully relied upon the accused teacher's "flirtatious manner" of "smiling, laughing, and tossing her hair" in front of targeted student football players.  The  Connecticut Supreme court, affirming summary judgment in favor of the institutional defendants, said "that conduct is simply too far removed from any type or instance of sexual abuse to supply reasonable cause to suspect an imminent risk of such abuse."  340 Conn. at 25.

Plaintiff's brief gives a cumulative effect to various individuals' declarations, in an effort to show Westover should have known Fitzsimmons was sexually abusing students.  *Madison*  rejected that tactic by a plaintiff of aggregating individual accounts "to create reasonable cause to suspect sexual abuse or imminent risk thereof," a practice "akin to charging the various high school employees with the responsibility of viewing a completed jigsaw puzzle, when all any of them could see at any relevant time was a piece or two."  340 Conn. at 28.  The *Madison* court also noted in its discussion that "there are no cases supporting a finding of reasonable suspicion without a reporter witnessing or being told firsthand of abuse."  *Id.* at 22.  There is no such evidence in the case at bar.

## VI.  Conclusion

Having carefully considered the extensive evidentiary record in this case, and applied the principles articulated by the cited cases to that record, I conclude that Defendant Westover is entitled to summary judgment dismissing the complaint of Plaintiff Emily Miranda.

Plaintiff Emily Miranda's Complaint against Westover seeks to recover damages inflicted upon her by Allen Fitzsimmons, an employee of Defendant Westover, at a time when Plaintiff was a student at Westover and Fitzsimmons subjected her to sexual abuse.  The evidentiary record shows that at the time Emily was a student at Westover, the responsible authorities at Westover did not know, and had no reasonable basis to suspect, that Fitzsimmons was sexually abusing Emily Miranda, or had a propensity to abuse her or any other Westover student.  Plaintiff has failed entirely to furnish specific evidence that at the pertinent times, Westover had such knowledge or suspicion, elements which are negated by Defendants' evidence.

This case is governed by Justice Scalia's declaration in *Scott v. Harris*: "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." 550 U.S. at 380 (citation and internal quotation marks omitted).   In the case at bar, given the evidentiary record as a whole, I conclude that no reasonable jury could find that at the time the nonmoving party, Plaintiff Emily Miranda, was a student at Defendant Westover School, Westover authorities knew or had reason to suspect Allen Fitzsimmons was a sexual predator.  It necessarily follows that Defendant is entitled as a matter of law to summary judgment dismissing Plaintiff's complaint.

This conclusion is the result, in large measure, of the reticence of the Miranda family: Plaintiff Emily Miranda and her parents, Karen and Raymond Miranda.  While Emily was a student

at Westover, she chose not to tell her parents, who had become concerned by Allen Fitzsimmons' conduct, about the sexual aspects of that conduct. Karen and Raymond Miranda chose not to tell the head of Westover about such objections as they had concerning Fitzsimmons' conduct until Emily had graduated from the School.

I do not make these observations in criticism of the Mirandas. In this life, we act or refrain from acting in manners that seem right to us at the time. But such decisions have consequences, sometimes legal in nature.

This is such a case. Under the governing law, Westover's liability for Fitzsimmons' abusive conduct depends on a showing of the School's knowledge or reasonable suspicion about Fitzsimmons' predatory sexual propensity, while Emily was a student. That is a requisite predicate for all claims for relief Plaintiff pleads in her Complaint. The Mirandas's reticence, however understandable in human terms, has the legal effect of rendering Plaintiff unable to establish that requisite predicate for Westover's liability.

Westover's entitlement to summary judgment necessarily follows.

## VII. Order

For the foregoing reasons, the Court makes this Order:

1.     The Motion of Defendant Westover School, Inc. [Doc. 40] for Summary Judgment, dismissing the Complaint of Plaintiff Emily Miranda, is GRANTED.

2.     This Order applies to all claims for relief pleaded in the Complaint.

2.     The Clerk of the Court is directed to DISMISS the Complaint WITH PREJUDICE,

in its entirety, and close the file.

It is SO ORDERED.

Dated:   New Haven, Connecticut
            September 21,  2022


*/s/Charles S. Haight, Jr.*
CHARLES S. HAIGHT, JR.
Senior United States District Judge

43